Kennedy Krieger Institute, Inc. v. Ashley Partlow, No. 82, September Term, 2017

**NEGLIGENCE – DUTY OF CARE – FACTORS GUIDING CONSIDERATION OF DETERMINING WHETHER DUTY EXISTS UNDER COMMON LAW – SPECIAL RELATIONSHIP – CLASS OF POTENTIAL PLAINTIFFS –** Court of Appeals held that duty of care exists in limited circumstances where: (1) medical research institute knows of presence of child, who is not participant in research study concerning lead-based paint abatement of property, who resides at property that is subject to research study during participant child's enrollment in study; (2) medical research institute has signed consent agreement with parent or guardian for participant child's enrollment in research study and both participant and non-participant children reside at property subject to study; (3) medical research institute knows or should know of presence or suspected presence of lead in property; (4) medical research institute determined level of lead-based paint abatement for property; and (5) non-participant child who resided at property during research study was allegedly injured by being exposed to lead at property. Court of Appeals held that, under circumstances of case, medical research institute owed plaintiff duty of care under common law.

Court of Appeals determined that holding is based on consideration of seven classic factors that Court has set forth for guidance in determining whether duty exists under common law—namely, foreseeability of harm to plaintiff, degree of certainty that plaintiff suffered injury, closeness of connection between defendant's conduct and injury suffered, moral blame attached to defendant's conduct, policy of preventing future harm, extent of burden to defendant and consequences to community of imposing duty, and availability, cost, and prevalence of insurance for risk involved. Factors weighed strongly in favor of imposing duty on medical research institute. Court of Appeals determined that imposing such duty did not create indeterminate class of potential plaintiffs.

Additionally, Court of Appeals held that, reviewing record in light most favorable to plaintiff, and construing against medical research institute any reasonable inferences that may be drawn from facts, there was sufficient evidence that medical research institute had special relationship with non-participant child plaintiff to submit issue to trier of fact, *i.e.*, jury.

Circuit Court for Baltimore City
Case No. 24-C-09-008243

Argued: May 8, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 82

September Term, 2017

_____

KENNEDY KRIEGER INSTITUTE, INC.

v.

ASHLEY PARTLOW

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by Watts, J.
Barbera, C.J., McDonald and Getty, JJ., dissent.

_____

Filed: August 13, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

This case concerns the important question of whether a duty of care extends from a medical research institute to a child, who was not a participant in a research study that sought to investigate the effectiveness of lead-based paint abatement measures,[1] but who the medical research institute knew resided in a property subject to the research study along with a family member participating in the study, and who was allegedly injured by exposure to lead. If the answer to this question is "yes," then a child who was not a participant in the research study but who the medical research institute knew resided in the property with a participant of the research study, would have an opportunity for recourse in the event of an alleged injury, as the medical research institute would owe that child a duty of care. To prevail, such a person would, of course, still need to establish the other three elements of negligence, *i.e.*, a breach of the duty of care, "a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages." Kiriakos v. Phillips, 448 Md. 440, 456, 139 A.3d 1006, 1016 (2016) (cleaned up). If the answer to the

_____

[1]In Grimes v. Kennedy Krieger Inst., Inc., 366 Md. 29, 36 & n.2, 782 A.2d 807, 811 & n.2 (2001), we characterized this study as "a nontherapeutic research program" and explained the difference between therapeutic research and nontherapeutic research as follows:

> At least to the extent that commercial profit motives are not implicated, therapeutic research's purpose is to directly help or aid a patient who is suffering from a health condition the objectives of the research are designed to address—hopefully by the alleviation, or potential alleviation, of the health condition.

> Nontherapeutic research generally utilizes subjects who are not known to have the condition the objectives of the research are designed to address, and/or is not designed to directly benefit the subjects utilized in the research, but, rather, is designed to achieve beneficial results for the public at large (or, under some circumstances, for profit).

question is "no," then a child who was not enrolled in the research study but who was allegedly injured would not have the ability to pursue a claim for negligence against the medical research institute, despite any purported injury. Thus, we must determine whether a duty of care exists under the circumstances.

Before we answer this significant question, we briefly set the stage. From 1993 to 1999, Kennedy Krieger Institute, Inc. ("KKI"), Petitioner, conducted a "Lead-Based Paint Abatement and Repair and Maintenance Study" ("the R&M Study") to investigate the effectiveness of various levels of repair and maintenance interventions, *i.e.*, lead-based paint abatement methods, in reducing exposure to lead in houses and reducing children's blood-lead levels. Shortly after the R&M Study concluded, in Grimes v. Kennedy Krieger Inst., Inc., 366 Md. 29, 48-56, 63, 782 A.2d 807, 819-24, 828 (2001), this Court discussed the R&M Study at length, and held that a trial court erred in granting KKI's motions for summary judgment in two cases in which the plaintiffs were child participants in the R&M Study by consent agreements. We explained:

> Such research programs[, *e.g.*, the R&M Study,] normally create special relationships and/or can be of a contractual nature, that create duties. The breaches of such duties may ultimately result in viable negligence actions. Because, at the very least, there are viable and genuine disputes of material fact concerning whether a special relationship, or other relationships arising out of agreements, giving rise to duties existed between KKI and both sets of [plaintiff]s, we hold that the [trial c]ourt erred in granting KKI's motions for summary judgment in both cases . . . . Accordingly, we vacate the rulings of the [trial court] and remand the[] cases to that court for further proceedings[.]

Id. at 48, 782 A.2d at 819. Stated otherwise, in Grimes, id. at 48, 782 A.2d at 819, this Court concluded that a duty of care may exist between KKI and a participant in the R&M Study. In Grimes, id. at 113, 782 A.2d at 858, this Court concluded "that, under certain

circumstances, [consent] agreements can, as a matter of law, constitute 'special relationships' giving rise to duties, out of the breach of which negligence actions may arise[,]" and "that, normally, such special relationships are created between researchers and the human subjects used by the researchers."

In this case, Ashley Partlow ("Ashley"), Respondent, filed in the Circuit Court for Baltimore City ("the circuit court") a complaint against KKI alleging negligence and violations of the Baltimore City Housing Code and the Maryland Consumer Protection Act. Unlike the plaintiffs in Grimes, however, Ashley was not a participant in the R&M Study, which only included children aged six months to four years. In May 1994, when Ashley's mother, Jacqueline Martin, completed an eligibility questionnaire for the R&M Study, Ashley was five years old, and was ineligible to be a participant. In May 1994, Ashley's younger sister, Anquenette Partlow ("Anquenette"), who was two years old, became a participant in the R&M Study through a consent form signed by Martin. Although Ashley was not a participant in the R&M Study, she lived in the subject property with her family, including Anquenette, during her younger sister's participation in the R&M Study.

In response to Ashley's complaint, KKI filed various motions for summary judgment, including one concerning the claim for negligence, arguing that it did not owe a legal duty to Ashley because Ashley was not a participant of the R&M Study and it did not own, lease, or operate the subject property. Following a hearing, the circuit court issued an order granting the motions for summary judgment. In a memorandum opinion, the circuit court concluded that KKI did not owe Ashley a duty of care, and that the researcher-

subject duty that this Court recognized in <u>Grimes</u> did not extend to Ashley. The circuit court also ruled that KKI did not owe Ashley a duty of care under the Baltimore City Housing Code, and that Ashley had failed to allege facts sufficient to support a claim for violation of the Maryland Consumer Protection Act.

Ashley appealed. In an unreported opinion, the majority of a panel of the Court of Special Appeals reversed the circuit court's grant of summary judgment in KKI's favor as to Ashley's negligence claim, concluding that a "special relationship created by the R & M Study encompassed her as well as her sister." <u>Ashley Partlow v. Kennedy Krieger Inst., et al.</u>, Nos. 44 and 530, Sept. Term, 2015, 2017 WL 4772626, *1 (Md. Ct. Spec. App. Oct. 23, 2017). The Court of Special Appeals held that KKI owed Ashley a duty of care under the common law, stating "that KKI owed to Ashley the same duty of care it owed to R & M Study participants who lived in the same dwelling pursuant to the same lease agreement." <u>Id.</u> at *7, *9. The Court of Special Appeals held, however, that the circuit court properly granted summary judgment as to the claims for violations of the Baltimore City Housing Code and the Maryland Consumer Protection Act. <u>See id.</u> at *9, *10. The Honorable Stuart R. Berger dissented as to the holding that KKI owed Ashley a duty of care under the common law, and concurred with the majority's holdings that the circuit court properly granted summary judgment on the claims for violations of the Baltimore City Housing Code and the Maryland Consumer Protection Act. <u>See id.</u> at *10 (Berger, J., concurring and dissenting).

KKI filed a petition for a writ of *certiorari*, raising one issue: "Whether the [Court of Special Appeals], relying on *Grimes*, erred in imposing a duty on [KKI] to an individual

who was not enrolled in the research study at issue[.]" This Court granted the petition. See Kennedy Krieger Inst. v. Partlow, 457 Md. 398, 178 A.3d 1242 (2018).

In Doe v. Pharmacia & Upjohn Co., Inc., 388 Md. 407, 415, 879 A.2d 1088, 1092-93 (2005), we explained duty of care and the determination of whether a duty exists as follows:

> Duty is an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another. There is no set formula for the determination of whether a duty exists. We have applied a foreseeability of harm test, which is based upon the recognition that duty must be limited to avoid liability for unreasonably remote consequences. We also have looked at the relationship of the parties.
>
> At its core, the determination of whether a duty exists represents a policy question of whether the plaintiff is entitled to protection from the defendant.

(Cleaned up). And, in Kiriakos, 448 Md. at 486, 139 A.3d at 1033-34, we set forth "the classic factors we use to decide questions of duty under the common law":

> the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost[,] and prevalence of insurance for the risk involved.

(Cleaned up); see also Doe, 388 Md. at 416, 879 A.2d at 1093 (This Court set forth the same factors, characterizing them as a "non-exhaustive list for balancing the policy considerations inherent in the determination of whether a duty exists[.]").

Against this backdrop, we hold that a duty of care exists in the limited circumstances where: (1) a medical research institute knows of the presence of a child, who is not a

participant in a research study concerning lead-based paint abatement of a property, who resides at a property that is subject to the research study during a participant child's enrollment in the study; (2) the medical research institute has signed a consent agreement with a parent or guardian for a participant child's enrollment in the research study and both the participant and non-participant children reside at a property subject to the study; (3) the medical research institute knows or should know of the presence or suspected presence of lead in the property; (4) the medical research institute determined the level of lead-based paint abatement for the property; and (5) the non-participant child who resided at the property during the research study was allegedly injured by being exposed to lead at the property. Put plainly, under the circumstances of this case, KKI owed Ashley a duty of care under the common law. Our holding is based on the balance of the factors set forth in Kiriakos for determining the existence of a duty under the common law, as consideration of those factors weighs heavily in favor of imposing a duty on KKI to Ashley, and imposing a duty of care on KKI does not create an indeterminate class of potential plaintiffs exposing KKI to unending liability. Additionally, irrespective of the establishment of a duty under traditional tort analysis, the circuit court erred in granting summary judgment in KKI's favor because there was sufficient evidence of a special relationship between KKI and Ashley to submit the issue to the trier of fact.

## BACKGROUND

### The R&M Study

From 1993 to 1999, KKI, a research organization associated with The Johns Hopkins Hospital, Johns Hopkins University, Johns Hopkins University School of

Medicine, and Johns Hopkins University School of Public Health (together, "Johns Hopkins"), conducted the R&M Study to investigate the use of lead-based paint abatement measures in reducing exposure to lead in houses. In Grimes, 366 Md. at 36-37, 782 A.2d at 811-12, we provided the following overview of the R&M Study:

> [KKI] created a nontherapeutic research program whereby it required certain classes of ho[us]es to have only partial lead paint abatement modifications performed, and in at least some instances, . . . arranged for the landlords to receive public funding by way of grants or loans to aid in the modifications. [KKI] then encouraged, and in at least one [instance], required, the landlords to rent the premises to families with young children. In the event young children already resided in one of the study houses, it was contemplated that a child would remain in the premises, and the child was encouraged to remain, in order for his or her blood to be periodically analyzed. In other words, the continuing presence of the children that were the subjects of the study was required in order for the study to be complete. . . .

> The purpose of the research was to determine how effective varying degrees of lead paint abatement procedures were. Success was to be determined by periodically, over a two-year period of time, measuring the extent to which lead dust remained in, or returned to, the premises after the varying levels of abatement modifications, and . . . by measuring the extent to which the theretofore healthy children's blood became contaminated with lead, and comparing that contamination with levels of lead dust in the houses over the same periods of time.

(Footnote omitted).[2]

---

[2]In Grimes, id. at 120, 782 A.2d at 862, as to whether the R&M study was, indeed, "nontherapeutic[,]" in response to a motion for reconsideration, we clarified:

> In the Opinion, we said at one point that a parent "cannot consent to the participation of a child . . . in nontherapeutic research or studies in which there is any risk of injury or damage to the health of the subject." As we think is clear from Section VI of the Opinion, by "any risk," we meant any articulable risk beyond the minimal kind of risk that is inherent in any endeavor. The context of statement was a non-therapeutic study that promises no medical benefit to the child whatever, so that any balance

(Continued...)

The R&M Study was approved by the Johns Hopkins University Joint Committee on Clinical Investigation, an Institutional Review Board. See id. at 38-39, 782 A.2d at 813. Mark R. Farfel, Sc.D., who was the director of KKI's Lead Abatement Research Department throughout the R&M Study, testified at a deposition in one of the cases consolidated in Grimes that the R&M Study was specifically "designed to do less" than "full lead paint abatement" in older houses in Baltimore "in order to find out if more practical approaches had advantages" and that loan amounts for repairs were limited. The purpose of the R&M Study was to specifically determine the "short and long-term efficacy of full lead-paint abatement and more practical and lower cost Repair and Maintenance [] interventions for reducing levels of lead in residential house dust which in turn should reduce lead in children's blood." According to Dr. Farfel, KKI conducted the R&M Study to determine the impact of completing lead-based paint abatement work that was less than either complete lead-based paint removal or "enclosure, isolation[.]"

The R&M Study divided participating properties into five test groups, each group consisting of twenty-five houses. See Grimes, 366 Md. at 50, 782 A.2d at 820. Of those five test groups, Groups 1, 2, and 3 "consisted of houses with a considerable amount of lead dust present therein and each group received assigned amounts of maintenance and

---

between risk and benefit is necessarily negative. As we indicated, the determination of whether the study in question offered some benefit, and therefore could be regarded as therapeutic in nature, or involved more than that minimal risk is open for further factual development on remand.

(Internal quotation marks and ellipsis in original). In light of this clarification, we use the phrase "nontherapeutic" research study only in recounting what this Court stated in Grimes.

repair." Id. at 50-51, 782 A.2d at 820 (footnote omitted). Group 4 consisted of houses that, at one time, had lead-based paint present, but that had received a supposedly complete abatement of lead dust. See id. at 51, 782 A.2d at 820. And, Group 5 consisted of modern houses that had never had lead dust present. See id. at 51, 782 A.2d at 820. The goal of the R&M Study "was to analyze the effectiveness of different degrees of partial lead paint abatement in reducing levels of lead dust present in" the houses in the different groups, and, ultimately, "to find a less than complete level of abatement that would be relatively safe, but economical, so that Baltimore landlords with lower socio-economical rental units would not abandon the units." Id. at 51, 782 A.2d at 820-21.

Groups 1, 2, and 3 were the experimental groups of the R&M Study, and properties in Groups 1, 2, and 3 received different levels of repair and maintenance, with properties in Group 1 receiving a minimal level of repair and maintenance with costs capped at $1,650, properties in Group 2 receiving a greater level of repair and maintenance with costs capped at $3,500, and properties in Group 3 receiving an even greater level of repair and maintenance with costs capped between $6,000 and $7,000. See id. at 52-53, 782 A.2d at 821-22. In Grimes, id. at 53, 782 A2d at 822, we explained the differences of repair and maintenance among Groups 1, 2, and 3:

> Repair & Maintenance Level I interventions were capped by [the Department of Housing and Community Development ("DHCD")] at $1,650 and included wet-scraping of peeling and flaking lead-based paint and paint of unknown composition on all interior surfaces, including walls, trim, and doors; repainting of treated surfaces; installation of window well caps; repainting of all exterior window trim, repainting of all interior window sills; vacuuming of all horizontal surfaces and window components with a high efficiency particulate (HEPA) vacuum; and wet cleaning all horizontal surfaces. Level II interventions were capped by DHCD at $3,500 and

- 9 -

included all the elements of Level I intervention plus two key additional elements: use of sealants and paints to make floors smoother and more easily cleanable, and in-place window and door treatments to reduce abrasion of lead-painted surfaces. Level III interventions were capped by DHCD at $6,000-$7,000 and added window replacement and encapsulation of exterior door trim with aluminum, and the use of coverings on some floors and stairs to make them smooth and more easily climbable.

(Footnote omitted).

With respect to properties in Groups 1, 2, and 3, measurements of children's blood-lead levels, lead dust, lead in the soil, and lead in the drinking water were to be taken at certain points in time:

> Measurements of lead in the blood of the children and vacuum dust samples from the houses were to be obtained at the following times: pre-intervention, immediately post intervention, and one, three, six, twelve, eighteen, and twenty-four months post intervention. Measurements of lead in the exterior soil were to be obtained at pre-intervention, immediately post intervention, and twelve and twenty-four months post intervention. Measurements of lead in drinking water were to be obtained at pre-intervention, and twelve and twenty-four months post intervention. Additionally, the parents of the child subjects of the study were to fill out a questionnaire at enrollment and at six-month intervals.

Grimes, id. at 53-54, 782 A.2d at 822.

The key requirement for properties that were to be a part of Groups 1, 2, and 3 was the presence, or suspected presence, of lead in the property. Testifying at deposition, Dr. Farfel described the requirements that applied to the occupants of properties enrolled in the R&M Study:

> For the family participant side, we were looking for families that obviously were willing to cooperate with the study by signing informed consent statements. We were looking for families that had at least one child under the age of 48 months and older than five months at the start of the study. These children were not to be mentally retarded or severely handicapped in any way that would limit their physical movement. . . . We

asked the families if they had any immediate plans to move. If they did, then they weren't eligible because we were interested in following the family over a period of years.

Put simply, the key requirement with respect to occupants of the properties was the presence of young children in a certain age group who would occupy the properties for a period of years.

To entice property owners to permit their properties to be used in the R&M Study, "and in return for limiting their tenants to families with young children, KKI assisted the landlords in applying for and receiving grants or loans of money to be used to perform the levels of abatement required by KKI for each class of ho[us]e." Id. at 52, 782 A.2d at 821. KKI visited properties to obtain consent from the parents to measure the blood-lead levels of the young children. KKI did so by having parents sign a "Clinical Investigation Consent Form." The Clinical Investigation Consent Form signed by Ashley's mother for Ashley's sister's enrollment in the R&M Study provided boilerplate language setting forth the "purpose" of the R&M Study and its "benefits":

PURPOSE OF STUDY:

As you may know, lead poisoning in children is a problem in Baltimore City and other communities across the country. Lead in paint, house dust and outside soil are major sources of lead exposure for children. Children can also be exposed to lead in drinking water and other sources. We understand that your house is going to have special repairs done in order to reduce exposure to lead in paint and dust. On a random basis, ho[us]es will receive one of two levels of repair. We are interested in finding out how well the two levels of repair work. The repairs are not intended, or expected, to completely remove exposure to lead.

We are now doing a study to learn about how well different practices work for reducing exposure to lead in paint and dust. We are asking you and over one hundred other families to allow us to test for lead in and around your

- 11 -

ho[us]es up to 8 times over the next two years provided that your house qualifies for the full two years of study. Final eligibility will be determined after the initial testing of your ho[us]e. We are also doing free blood lead testing of children aged 6 months to 7 years, up to 8 times over the next two years. We would also like you to respond to a short questionnaire every 6 months. This study is intended to monitor the effects of the repairs and is not intended to replace the regular medical care your family obtains.

\* \* \*

BENEFITS:

To compensate you for your time answering questions and allowing us to sketch your ho[us]e we will mail you a check in the amount of $5.00. In the future we would mail you a check in the amount of $15 each time the full questionnaire is completed. The dust, soil, water, and blood samples would be testified for lead at [KKI] at no charge to you. We would provide you with specific blood-lead results. We would contact you to discuss a summary of house test results and steps that you could take to reduce any risks of exposure.

As we summarized in Grimes, id. at 55-56, 782 A.2d at 823-24, the basic parameters

of the R&M Study were as follows:

KKI conducted a study of five test groups of twenty-five houses each. The first three groups consisted of houses known to have lead present. The amount of repair and maintenance conducted increased from Group 1 to Group 2 to Group 3. The fourth group consisted of houses, which had at one time lead present but had since allegedly received a complete abatement of lead dust. The fifth group consisted of modern houses, which had never had the presence of lead dust. The twenty-five ho[us]es in each of the first three testing levels were then to be compared to the two control groups: the twenty-five ho[us]es in Group 4 that had previously been abated and the 25 modern ho[us]es in Group 5. The research study was specifically designed to do less than full lead dust abatement in some of the categories of houses in order to study the potential effectiveness, if any, of lesser levels of repair and maintenance.

. . . [I]t would benefit the accuracy of the test, and thus KKI, the compensated researcher, if children remained in the houses over the period of the study even after the presence of lead dust in the houses became evident.

- 12 -

(Footnote omitted).

## This Case

### *The Property*

From 1982 to 1992, Lawrence Polakoff owned a house located at 1906 East Federal Street in Baltimore City ("the Property"). In 1992, Polakoff transferred ownership of the Property to CFOD-2 Limited Partnership, a limited partnership that had an entity known as Chase Management, Inc. as its general partner. Polakoff is the president of Chase Management, which took care of the day-to-day operations and management of the Property. According to Polakoff, he was solicited by KKI, and volunteered the Property to be a part of the R&M Study.

In December 1993, KKI hired an outside contractor to test the Property for the presence of lead-based paint and lead dust. The Property tested positive for the presence of lead-based paint throughout the house, at a multitude of locations. The Property also tested positive for the presence of lead dust throughout the house. According to Dr. Farfel, both the testing for lead-based paint and lead dust qualified the Property for the R&M Study, and the Property was deemed structurally sound. Once it qualified for the R&M Study, the Property was randomly assigned to Level II intervention, *i.e.*, Group 2. As such, the cost of repairs was capped at $3,500. In a letter dated April 12, 1994, a company named Environmental Restorations, Inc. sent Polakoff a "Lead Paint Abatement/Construction Proposal" proposing repairs totaling $3,500 that were "designed to remove or encapsulate certain lead[-]based painted surfaces within the [P]roperty." Polakoff gave approval for the repairs in that amount to be done, and the repairs were completed sometime shortly

thereafter.

*Ashley*

On December 10, 1988, Ashley was born. From birth until 1994, Ashley resided with her mother, Martin, at various properties. At some point in 1994, Martin and her friend, Catina Higgins, learned that the Property was available to rent. According to Martin, when the women asked about renting the Property, they were advised that, as part of the rental application, they would need to provide their children's blood-lead level test results. According to Martin, after she asked why blood-lead level test results were needed, the management office responded that it was required because the Property was "lead-free" and that either $7,000 or $17,000 worth of repairs had been done on the Property.

On May 13, 1994, Martin and Higgins signed a lease, renting the Property. The lease stated that the following individuals would reside at the Property: Higgins, Martin, Myron Higgins (identified as a "child"),[3] Ashley (identified as a "child"), and Anquenette (identified as a "child"). Shortly after the lease was signed, all five individuals—the two women and three children—moved into the Property. At that time, Ashley was five years old and Anquenette was two years old.

According to Martin, shortly after moving into the Property, she met with a KKI representative, completed a questionnaire, and agreed to send Ashley and Anquenette to KKI to have their blood drawn. The questionnaire was completed on May 24, 1994. The

---

[3]Higgins's son, Myron, was one of the plaintiffs in <u>Grimes</u>, 366 Md. at 47, 61-65, 782 A.2d at 818, 827-31, and his allegations in that case were based on his residency at the Property during the same time that Ashley resided at the Property.

questionnaire was designed to be used by a KKI representative to determine whether a household would or would not be eligible for participation in the R&M Study. The questionnaire that Martin completed appears to have been filled in by a KKI representative; Martin's signature is not on the questionnaire, but the KKI representative's initials are. According to the questionnaire, Martin indicated that one child between the ages of six months and four years lived in the Property, and she provided Anquenette's information, including her date of birth. Significantly, as part of the questionnaire, the KKI representative asked Martin to identify the name, age, sex, and race of each occupant of the Property. According to the questionnaire, Martin identified herself, Higgins, Ashley, Myron, and Anquenette, and indicated the respective ages of the individuals, including that Ashley was five years old.[4] On May 24, 1994, the same day that Martin answered questions for the eligibility questionnaire, Martin enrolled Anquenette in the R&M Study by signing a Clinical Investigation Consent Form.

At a deposition, as part of this case, Martin testified about the circumstances surrounding leasing the Property and blood-lead level testing of her children:

> [MARTIN:] I asked if we didn't -- if the doctors didn't -- if they didn't get the lead levels, what would be -- would we still be able to rent the house. They said no.

---

[4]The questionnaire contained the following question: "How many people live in this household?" The number "05" is written into the two boxes provided next to the question. The questionnaire next stated: "For each person, please tell me that person's first name, age, sex and race. Please start with the oldest member of the household and work down to the youngest." The questionnaire provided numbered lines and boxes next to each line for the representative to record the name, sex, age, and race of each identified occupant. Ashley's information is listed on the third line, after Higgins's and Martin's, and Ashley is identified as female, five years old, and "Black/Afr-Am (Non-Hispanic)" according to the code provided in the box for race.

[JOHNS HOPKINS'S COUNSEL:] Okay. And who said that?

[MARTIN:] The representative at the rental office.

[JOHNS HOPKINS'S COUNSEL:] Okay. That was when they asked -- when they said we need to get your children's lead levels?

[MARTIN:] Yes.

[JOHNS HOPKINS'S COUNSEL:] And you said if I don't get them, can I rent and --

[MARTIN:] If they didn't receive the kids' lead levels, we wouldn't be able to move in.

Martin also testified that someone in the management office told her that the Property was "lead-free" before she moved in, but that Polakoff told her that the basement had lead-based paint in it. Martin testified that she believed that KKI was testing Ashley and Anquenette to ensure that their blood-lead levels were safe, and denied knowing that the family was participating in the R&M Study:

> [W]hen [KKI] came to the house, they -- when they asked me did I want my kids to go to [KKI] to get their lead levels taken, which I thought would be a good gesture, a good thing to make sure my kids didn't -- did not have lead, that's how I took it. I didn't know -- she never mentioned to me by word of mouth that it was a study. . . . So I -- I'm feeling as a parent that, okay, I live in a lead-free house. Now, here is [KKI] telling me, okay, we're going to monitor your kids to -- we're going -- we're taking them to [KKI]. We're drawing their blood. We're getting their lead levels to show you they have safe lead levels. That was my end take on it. I wasn't told that it was – they were – they were being part of a study[.]

In a letter dated June 24, 1994, one month after Anquenette was enrolled in the R&M Study, KKI notified Martin and Higgins that dust in the Property had been tested for lead on May 17, 1994, that the chart included in the letter indicated the areas where dust

- 16 -

was collected, and that an asterisk was placed "next to areas where the amount of lead was higher than might be found in a completely renovated house." The letter also advised: "Remember there is no rule for how much lead is allowed in the dust from a house like yours." In the letter, KKI stated that dust had been collected from various locations throughout the first and second floors of the Property; no asterisk appeared next to any of the locations, thereby indicating that the amount of lead in the dust was not "higher than [what] might be found in a completely renovated house."

On September 14, 1994, KKI sent Martin and Higgins an identical letter, except that the letter had an asterisk indicating that the dust collected from "Floor" in "Rooms without windows" on the first floor of the Property contained an "amount of lead [that] was higher than might be found in a completely renovated house." On February 7, 1995, KKI sent another letter, this one indicating that the amount of lead collected in the dust from the "Floor" in "Rooms with windows" on the second floor of the Property "was higher than might be found in a completely renovated house." In all three letters, KKI stated that any areas marked with an asterisk should be given "special attention when [] cleaning the house."

During her tenancy at the Property, KKI maintained records on Ashley, including blood-lead level test results and a "Lead Poisoning Questionnaire" completed by a KKI representative on November 9, 1994, that detailed Ashley's residential history, hand-to-mouth activity, diet, "behavior and symptoms[,]" social history, and past medical history. (Cleaned up). As the circuit court noted, Ashley was treated at KKI, but not because she was a participant of the R&M Study. At a motions hearing, Ashley acknowledged that she

was seen at KKI because she was referred there through the Baltimore City Health Department. Nonetheless, the Lead Poisoning Questionnaire informed of Ashley's residence at the Property, and a blood-lead level report dated November 9, 1994 included the handwritten notation "In R&M House" on the upper-right portion of the page, indicating that KKI was aware that Ashley resided in a property subject to the R&M Study.

Martin, Ashley, Anquenette, Higgins, and Myron resided at the Property from May 1994 until some point in February 1995. According to Chase Management's records, on or about February 16, 1995, the two women and their three children moved out of the Property.

### Circuit Court Proceedings

On December 9, 2009, Ashley filed in the circuit court a complaint against KKI and others,[5] alleging, in relevant part, negligence, lack of informed consent, common law fraud and intentional misrepresentation, additional grounds for punitive damages, violation of the Baltimore City Housing Code, and violation of the Maryland Consumer Protection Act. According to Ashley, KKI was responsible for her exposure to lead at the Property based on Anquenette's enrollment in the R&M Study. Ashley alleged that KKI "controll[ed] the decisions about the scope of the repairs[,] the manner and means of repairs[,] and the level of interventions to be performed" at the Property.

After the filing of the complaint and answers by defendants, KKI filed various motions for summary judgment, including a motion for summary judgment as to

---

[5]In addition to KKI, Ashley named seventeen other defendants, including Johns Hopkins. Ashley ultimately dismissed her claims against of the defendants except KKI.

- 18 -

negligence. In the motion, KKI argued that it did not owe a duty to Ashley because: (1) Ashley was not a participant of the R&M Study; and (2) KKI did not own, lease, or operate the Property, and was not involved with Ashley's residence there. In an accompanying memorandum of law, KKI asserted that it had no duty to Ashley arising from a researcher-subject relationship because Ashley was not enrolled in the R&M Study. KKI also maintained that Ashley's negligence claim failed because there was no evidence that she suffered any injury resulting from exposure to lead at the Property. Ashley filed an opposition to the motion for summary judgment as to negligence, contending that her lack of participation in the R&M Study was of no consequence as to whether KKI owed her a duty of care. Ashley argued that KKI owed her a duty of care for several reasons, including that KKI knew that she was residing at the Property and that she was going to be exposed to lead there.

On February 13, 2015, the circuit court conducted a hearing on the various motions, including KKI's motion for summary judgment as to negligence. At the conclusion of the hearing, the circuit court took the matter under advisement. On February 19, 2015, the circuit court issued an order granting KKI's motions for summary judgment, including the motion for summary judgment as to negligence.

On March 24, 2015, the circuit court issued a memorandum opinion explaining the reasons for the order. The circuit court concluded that KKI owed Ashley no duty of care, and, that "[t]he researcher-subject duty recognized in *Grimes* [] does not extend to [] Ashley[,]" and that KKI, therefore, was entitled to judgment as a matter of law as to the counts for negligence, lack of informed consent, common law fraud/intentional

misrepresentation, and additional grounds for punitive damages. The circuit court analogized this case to two cases in which this Court had "declined to extend tort duties to plainly foreseeable victims of alleged negligence[,]" specifically, <u>Dehn v. Edgecombe</u>, 384 Md. 606, 865 A.2d 603 (2005), and <u>Doe</u>, 388 Md. 407, 879 A.2d 1088. In <u>Dehn</u>, 384 Md. at 610-11, 865 A.2d at 605-06, a medical malpractice case, this Court held that a wife did not have an independent cause of action against her husband's primary care physician for alleged medical malpractice where, following the husband's vasectomy, the wife became pregnant. In <u>Doe</u>, 388 Md. at 409, 412, 419-20, 879 A.2d at 1089, 1090-91, 1095, a certified question of law from the United States Court of Appeals for the Fourth Circuit, this Court held that an employer did not owe a duty to an employee's spouse where, after the employee became infected with HIV-2 while handling the virus at work, the couple had unprotected intercourse, and the wife also became infected with HIV-2.

The circuit court recognized that, unlike this case, where Ashley's alleged exposure to lead "at the same time as her sister Anquenette[,]" both <u>Dehn</u> and <u>Doe</u> "involved sequential events[,]" in which the alleged injury to the plaintiffs occurred subsequently, as a result of contact with their husbands. Nonetheless, according to the circuit court, in both <u>Dehn</u> and <u>Doe</u>, the essential factor was the relationship giving rise to the duty and the fact that neither plaintiff had a direct relationship with either defendant who was alleged to have owed a duty. The circuit court found <u>Dehn</u> and <u>Doe</u> controlling, and ruled that the researcher-subject duty recognized in <u>Grimes</u> did not apply in this case. The circuit court ruled that KKI did not owe Ashley a duty of care under the Baltimore City Housing Code, concluding that the Baltimore City Housing Code imposed duties only on owners and

operators of residential properties, as those terms were defined in the code, and that KKI was neither an owner nor operator of the Property for purposes of the code. The circuit court also ruled that Ashley had failed to allege facts sufficient to support the claim for violation of the Maryland Consumer Protection Act.

### *Appellate Proceedings*

Ashley appealed. On October 23, 2017, in an unreported opinion, the majority of a panel of the Court of Special Appeals reversed the circuit court's grant of summary judgment as to negligence, concluding that "the special relationship created by the R & M Study encompassed her as well as her sister[,]" but affirmed the circuit court's grant of summary judgment as to the Baltimore City Housing Code and the Maryland Consumer Protection Act claims. Partlow, 2017 WL 4772626, at *1, *9-10. Relying on Grimes, the Court of Special Appeals held that KKI owed Ashley a duty of care under the common law, and "that KKI owed to Ashley the same duty of care it owed to R & M Study participants who lived in the same dwelling pursuant to the same lease agreement." Id. at *7, *9. The Court of Special Appeals explained:

> Ashley argues [] that the same circumstances that gave rise to the special relationship in *Grimes* include her as well. And we agree that under the circumstances they do, because the terms of the R & M Study determined the condition of the ho[us]e for all who lived there during the period of the operative lease, whether they participated directly in the R & M Study or not. It is not Ashley's mere status as a sibling that brings her within the *Grimes* duty—it is the fact that the terms of the Study, as they bound her mother and sister and landlord, drove the presence of lead in her environment and exposed her to the same lead to which it exposed Anqu[e]nette.

Partlow, 2017 WL 4772626, at *8.

The Court of Special Appeals acknowledged that Ashley was not a participant in

the R&M Study, but concluded that being a participant was not dispositive as to the issue of whether a duty of care existed, explaining:

> [W]e find it incongruous, and ultimately untenable, to say that, on the one hand, KKI owed a duty of care to Ashley's sister because it controlled the environment in which she was exposed to lead but, on the other hand, that it owed no duty to another child who lived in the same dwelling pursuant to the same lease and who was exposed to the same lead environment defined— and this is the key—by the terms of the same Study. Put another way, the structure and terms of the Study brought Ashley within the Study environment (defined and bounded by the lease agreement her mother entered with the participating landlord) and exposed her to the same hazards on the same terms as her Study-participant sister. Were it not for the R & M Study, the duty to maintain a safe and habitable environment for tenants would lie solely with the landlord. In this setting, though, and as *Grimes* recognized, the intervention of research motivations and protocols influenced the environment in which Anqu[e]nette and Ashley lived, and that may have resulted in toxic exposure to lead.

Partlow, 2017 WL 4772626, at \*9 (emphasis omitted). The Court of Special Appeals distinguished Dehn and Doe, stating that, in those cases, the wives' "secondary exposure fell outside the special relationship between the alleged tortfeasor and their husbands," whereas, in this case, "Ashley allege[d] that she was exposed to lead directly, through the same modality as her Study-participant sister, in the same environment that the Study controlled." Partlow, 2017 WL 4772626, at \*9. Judge Berger concurred and dissented. See id. at \*10 (Berger, J., concurring and dissenting).

Thereafter, KKI filed a petition for a writ of *certiorari*, which this Court granted on February 5, 2018. See Partlow, 457 Md. 398, 178 A.3d 1242.

## DISCUSSION

### The Parties' Contentions

KKI contends that that the Court of Special Appeals erroneously relied on Grimes

in holding that it owed a duty of care to Ashley. KKI argues that it did not have a "direct relationship" with Ashley, who was not enrolled in the R&M Study, and that, notwithstanding the foreseeability of the harm alleged, a duty must be premised on the existence of a "direct relationship" between a plaintiff and a defendant. KKI asserts that Grimes is distinguishable from this case because Ashley did not participate in the R&M Study, KKI never obtained informed consent from Martin for Ashley to participate, and KKI alleged that it did not monitor Ashley, gather information about her, or treat her for lead exposure or injuries. KKI maintains that the Court of Special Appeals impermissibly expanded Grimes to create a duty between KKI and any individual who lived in a property with an R&M Study participant, creating an indeterminate class of potential plaintiffs to whom a duty would extend. According to KKI, it was inconsistent for the Court of Special Appeals to hold that KKI owed Ashley a duty under the common law while at the same time not finding a duty arising under the Baltimore City Housing Code.[6]

Ashley responds that that the circumstances of this case demonstrate that a duty of care is warranted because KKI knew that the Property contained lead and knew that Ashley—then a child—was residing in the Property and that she would be exposed to lead in the same manner and under the same conditions as her sister. Ashley asserts that there is no logical basis on which to distinguish between her and her sister for purposes of determining whether KKI owed a duty. Ashley maintains that, in determining whether a duty of care exists in personal injury cases, Maryland courts focus on the foreseeability of

[6]Johns Hopkins and the Maryland Hospital Association, Incorporated filed amicus briefs in support of KKI.

- 23 -

the harm, not on the existence of a "direct relationship" between the plaintiff and defendant. Ashley contends that, in personal injury cases, a "direct relationship" is not required for a duty to exist. Ashley argues that, instead, courts examine a set of factors, including, among other things, the foreseeability of harm to a plaintiff, as well as the degree of certainty that the plaintiff suffered the injury.

Ashley asserts that, even if a relationship between a plaintiff and defendant is required to establish a duty of care, she and KKI had such a relationship. Ashley maintains that duties created by the special relationship between KKI and her sister should be extended where KKI knew that she was being exposed to the same hazard and knew the exposure extended to a minor child who was vulnerable to the toxin at issue. Ashley argues that recognizing the existence of a duty in this case does not create an indeterminate class of potential plaintiffs because only a limited number of individuals are in the same position as she is—namely, children who KKI knew would be exposed to the exact same danger as the R&M Study participants. Ashley asserts that Dehn, Doe, and Gourdine v. Crews, 405 Md. 722, 955 A.2d 769 (2008), are distinguishable because those cases involved sequential, attenuated events where the injured person was not directly exposed to a negligent act.

**Standard of Review**

In Chateau Foghorn LP v. Hosford, 455 Md. 462, 482, 168 A.3d 824, 835 (2017), we explained that we review without deference a trial court's grant of summary judgment and set forth the following applicable standard of review:

> A court may grant summary judgment in favor of the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to

- 24 -

judgment as a matter of law.

> The question of whether a trial court's grant of summary judgment was proper is a question of law subject to *de novo* review on appeal. In reviewing a grant of summary judgment under Maryland Rule 2-501, we independently review the record to determine whether the parties properly generated a dispute of material fact, and, if not, whether the moving party is entitled to judgment as a matter of law. We review the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party.

(Cleaned up). And, in Doe, 388 Md. at 414, 879 A.2d at 1092, this Court stated that "[t]he existence of a legal duty is a question of law, to be decided by the court." (Citations omitted).

## Law

### *Negligence and Duty of Care*

To state a claim of negligence in Maryland, a plaintiff must establish the following four elements: "a duty owed to him [or her] (or to a class of which he [or she] is a part), a breach of that duty, a legally cognizable causal relationship between the breach of the duty and the harm suffered, and damages." Kiriakos, 448 Md. at 456, 139 A.3d at 1016 (cleaned up). Because "[t]here can be no negligence where there is no duty that is due[,]" an analysis as to negligence usually begins "with the question of whether a legally cognizable duty exi[s]ts." Doe, 388 Md. at 414, 879 A.2d at 1092 (cleaned up).

We have described "duty" for purposes of negligence as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." Dehn, 384 Md. at 619, 865 A.2d at 611 (cleaned up). As we have

recognized, "the determination of whether a duty exists represents a policy question of whether the plaintiff is entitled to protection from the defendant." Doe, 388 Md. at 415, 879 A.2d at 1093 (citation omitted). In Kiriakos, 448 Md. at 486, 139 A.3d at 1033-34, we set forth "the classic factors we use to decide questions of duty under the common law":

> the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost[,] and prevalence of insurance for the risk involved.

(Cleaned up).

Importantly, "[i]n cases involving personal injury, the principal determinant of duty becomes foreseeability." Doe, 388 Md. at 416, 879 A.2d at 1093 (cleaned up). In Jacques v. First Nat'l Bank of Md., 307 Md. 527, 534-35, 515 A.2d 756, 759-60 (1986), we explained:

> In determining whether a tort duty should be recognized in a particular context, two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant becomes foreseeability.

(Cleaned up). Nevertheless, "[a]lthough foreseeability is perhaps [the] most important among the[] factors, it alone does not justify the imposition of a duty." Kiriakos, 448 Md. at 486, 139 A.3d at 1034 (cleaned up).

In Grimes, 366 Md. at 47-48, 56, 63, 782 A.2d at 818-19, 824, 828, we held that trial courts erred in granting KKI's motions for summary judgment in two cases in which the plaintiffs were children who had been enrolled in the R&M Study through consent agreements and who allegedly developed elevated blood-lead levels while participating in the study. We explained:

> Such research programs[, *e.g.*, the R&M Study,] normally create special relationships and/or can be of a contractual nature, that create duties. The breaches of such duties may ultimately result in viable negligence actions. Because, at the very least, there are viable and genuine disputes of material fact concerning whether a special relationship, or other relationships arising out of agreements, giving rise to duties existed between KKI and both sets of [plaintiff]s, we hold that the [trial c]ourt erred in granting KKI's motions for summary judgment in both cases . . . . Accordingly, we vacate the rulings of the [trial court] and remand the[] cases to that court for further proceedings[.]

Id. at 48, 782 A.2d at 819. In Grimes, id. at 113, 782 A.2d at 858, this Court concluded "that, under certain circumstances, [consent] agreements can, as a matter of law, constitute 'special relationships' giving rise to duties, out of the breach of which negligence actions may arise."

In Grimes, id. at 38, 782 A.2d at 812-13, we were critical of the R&M Study, explaining that "it was anticipated that the children, who were the human subjects in the program, would, or at least might, accumulate lead in their blood from the dust, thus helping the researchers to determine the extent to which the various partial abatement methods worked." We observed that "[t]here was no complete and clear explanation in the consent agreements signed by the parents of the children that the research to be conducted was designed, at least in significant part, to measure the success of the abatement

procedures by measuring the extent to which the children's blood was being contaminated." Id. at 38, 782 A.2d at 813. We expressed the view that

> [o]therwise healthy children . . . should not be enticed into living, or remaining in, potentially lead-tainted housing and intentionally subjected to a research program, which contemplates the probability, or even the possibility, of lead poisoning or even the accumulation of lower levels of lead in blood, in order for the extent of the contamination of the children's blood to be used by scientific researchers to assess the success of lead paint or lead dust abatement measures.

Id. at 41, 782 A.2d at 814 (footnote omitted).

In Grimes, id. at 41-42, 782 A.2d at 815, we stated that, notwithstanding the issues presented in the cases, "the very inappropriateness of the research itself [could not] be overlooked[,]" and that the R&M Study "should never have been presented in a nontherapeutic context in the first instance" because "[n]othing about the research was designed for treatment of the subject children." We stated that it was "clear . . . that the scientific and medical communities cannot be permitted to assume sole authority to determine ultimately what is right and appropriate in respect to research projects involving young children free of the limitations and consequences of the application of Maryland law." Id. at 45, 782 A.2d at 817.

After reviewing the R&M Study unfavorably, we discussed the details of the cases before us. See id. at 47-71, 782 A.2d at 818-33. At the outset, we held that, "at the very least, . . . under the particular circumstances testified to by the parties, there are genuine disputes of material fact concerning whether a special relationship existed between KKI and [the plaintiffs, and] the granting of the summary judgment motions was clearly inappropriate." Id. at 74, 782 A.2d at 834. We noted that the plaintiffs alleged that KKI

owed them a duty of care, "as subjects in the research study, based on the nature of the agreements between them and also based on the nature of the relationship between the parties." Id. at 84, 782 A.2d at 841. This Court explained that the relationship between KKI and the plaintiffs "was that of [a] medical researcher and research study subject[s,]" and that "evidence in the record suggest[ed] that such a relationship involving a duty or duties would ordinarily exist, and certainly could exist, based on the facts and circumstances of each of the[] individual cases." Id. at 87, 782 A.2d at 842. And, we specifically held "that special relationships, out of which duties arise, the breach of which can constitute negligence, can result from the relationships between researcher and research subjects." Id. at 94, 782 A.2d at 846.

Ultimately, in Grimes, id. at 113-14, 782 A.2d at 858, we concluded that the trial courts in the two cases erred in granting summary judgment in KKI's favor:

> We hold that informed consent agreements in nontherapeutic research projects, under certain circumstances[,] can constitute contracts; and that, under certain circumstances, such research agreements can, as a matter of law, constitute "special relationships" giving rise to duties, out of the breach of which negligence actions may arise. We also hold that, normally, such special relationships are created between researchers and the human subjects used by the researchers. Additionally, we hold that governmental regulations can create duties on the part of researchers towards human subjects out of which "special relationships" can arise. . . .
>
> The determination as to whether a "special relationship" actually exists is to be done on a case by case basis. The determination as to whether a special relationship exists, if properly pled, lies with the trier of fact. We hold that there was ample evidence in the cases at bar to support a fact finder's determination of the existence of duties arising out of contract, or out of a special relationship, or out of regulations and codes, or out of all of them, in each of the cases.

(Cleaned up).

In so holding, we emphasized the foreseeability of the harm alleged, stating:

> [T]he risks associated with exposing children to lead-based paint were not only foreseeable, but were well known by KKI, and, in fact, it had to have been reasonably foreseeable by KKI that the children's blood might be contaminated by lead because the extent of contamination of the blood of the children would, in significant part, be used to measure the effectiveness of the various abatement methods.

Id. at 98, 782 A.2d at 849. Although "we acknowledge[d] that foreseeability does not necessarily create a duty, we recognize[d] that potential harm to the children participants of th[e R&M S]tudy was both foreseeable and potentially extreme." Id. at 103, 782 A.2d at 852. We reiterated our concern that one of the measurements of success of the R&M Study was "to be determined by the extent to which the blood of the children absorbs, and is contaminated by, a substance that the researcher knows can, in sufficient amounts, whether solely from the research environment or cumulative from all sources, cause serious and long term adverse health effects." Id. at 105, 782 A.2d at 853.

Later, this Court denied a motion for reconsideration, providing the following explanation:

> Although we discussed the various issues and arguments in considerable detail, the only conclusion that we reached as a matter of law was that, on the record currently before us, summary judgment was improperly granted—that sufficient evidence was presented in both cases which, if taken in a light most favorable to the plaintiffs and believed by a jury, would suffice to justify verdicts in favor of the plaintiffs. Thus, the cases were remanded for further proceedings in the [trial c]ourt. Every issue bearing on liability or damages remains open for further factual development, and any relevant evidence not otherwise precluded under our rules of evidence is admissible.
>
> Much of the argument in support of and in opposition to the motion for reconsideration centered on the question of what limitations should govern a parent's authority to provide informed consent for the participation of his or her minor child in a medical study. In the Opinion, we said at one

- 30 -

point that a parent "cannot consent to the participation of a child . . . in nontherapeutic research or studies in which there is any risk of injury or damage to the health of the subject." As we think is clear from Section VI of the Opinion, by "any risk," we meant any articulable risk beyond the minimal kind of risk that is inherent in any endeavor. The context of the statement was a non-therapeutic study that promises no medical benefit to the child whatever, so that any balance between risk and benefit is necessarily negative. As we indicated, the determination of whether the study in question offered some benefit, and therefore could be regarded as therapeutic in nature, or involved more than that minimal risk is open for further factual development on remand.

Id. at 119-20, 782 A.2d at 861-62.[7]

### *Other Case Law*

In Dehn, 384 Md. at 610, 865 A.2d at 605, a medical malpractice case, this Court held that a wife did not have an independent cause of action against her husband's doctor, who allegedly acted negligently while treating her husband. The doctor referred the husband to a surgeon, who performed a vasectomy. See id. at 611, 865 A.2d at 606. The husband later engaged in unprotected intercourse with his wife, who became pregnant. See id. at 612, 865 A.2d at 606. At issue in the case were the conversations that the husband and the doctor had in the time between the vasectomy and the wife becoming pregnant. See id. at 612-14, 865 A.2d at 606-08. At trial, at the close of the husband's and wife's case, the trial court granted the doctor's motion for judgment with respect to the wife's

---

[7]Recently, in White v. Kennedy Krieger Inst., Inc., 221 Md. App. 601, 625, 110 A.3d 724, 738, cert. denied, 443 Md. 237, 116 A.3d 476 (2015), the Court of Special Appeals noted that, in Grimes, "the Court did not set forth absolute and determinate standards regarding the creation of a special relationship or the duty owed by a researcher to the subject." (Citation omitted). The Court of Special Appeals concluded that Grimes stands for the proposition "that a duty *may* arise in such circumstances where the researcher has a superior knowledge of the risks of the study." White, 221 Md. App. at 630, 110 A.3d at 741 (emphasis in original).

claims.  See id. at 615, 865 A.2d at 608.  The husband and wife appealed, and the Court of Special Appeals affirmed.  See id. at 615, 865 A.2d at 608.

In this Court, as to whether a duty of care existed between the wife and the doctor, we began with "the general rule that recovery for malpractice against a physician is allowed only where there is a relationship between the doctor and a patient[,]" and that such a "relationship is a consensual one, and when no prior relationship exists, the physician must take some action to treat the person before the physician-patient relationship can be established."  Id. at 620, 865 A.2d at 611.  Applying this principle, we concluded that the doctor owed no duty to the wife, as the wife and doctor had no physician-patient relationship, and, indeed, the two had never met or spoken to one another until trial.  See id. at 622, 865 A.2d at 612.  We observed that the Court of Special Appeals noted the following: the doctor was the husband's primary healthcare provider, not the wife's; the husband, not the wife, was in the healthcare program that involved the doctor; and, on the three post-vasectomy occasions when the doctor was allegedly negligent, the husband was not visiting the doctor to discuss post-operative care related to the vasectomy, but was visiting the doctor, without the wife, for unrelated medical reasons.  See id. at 622, 865 A.2d at 612-13.

As to other arguments in favor of imposing a duty, we stated that the "mere foreseeability of harm or injury is insufficient to create a legally cognizable special relationship giving rise to a legal duty to prevent harm."  Id. at 624, 865 A.2d at 614. We observed that "it is only in a limited number of cases where a special relationship sufficient to impose a duty of care will be found in the absence of traditional tort duty[,]" and

ultimately determined that <u>Dehn</u> was not such a case.  <u>Id.</u> at 625, 865 A.2d at 614 (citations omitted).  We rejected the contention that there was a special relationship based on the foreseeability of injury to the wife in a medical malpractice case.  See <u>id.</u> at 625-26, 865 A.2d at 614.  We expressed concern that imposing a common law duty on the doctor to the wife based on the circumstance that she was the husband's wife "could expand traditional tort concepts beyond manageable bounds" and that such a "rationale for extending the duty would apply to all potential sexual partners and expand the universe of potential plaintiffs." <u>Id.</u> at 627, 865 A.2d at 615.

In <u>Doe</u>, 388 Md. at 409-10, 879 A.2d at 1089, in response to certified questions of law from the United States Court of Appeals for the Fourth Circuit, this Court held that an employer, a commercial manufacturer of two strains of HIV (HIV-1 and HIV-2), did not owe a duty to its employees' spouses to exercise reasonable care either in conducting testing, including testing for both strains of HIV, or in informing its employees of the nature of the test results.  John Doe, who was married, worked for the employer as a laboratory technician at a viral production facility, and for six years, he was exposed to high concentrations of HIV-1 and HIV-2 while working.  See <u>id.</u> at 410, 879 A.2d at 1089-90. Starting around 1985, every six months the employer began testing its employees, including John Doe, who were exposed to HIV in the workplace.  See <u>id.</u> at 410-11, 879 A.2d at 1090.  As of 1989, a person who was infected with HIV-2 could test positive on the "Elisa test," but negative on the "Western blot test," which was considered a false positive for HIV-1.  <u>Id.</u> at 411, 879 A.2d at 1090.  John Doe tested negative until 1989, when he received a false positive on the Elisa test; upon retesting, the result was negative,

and subsequent testing results were also negative. See id. at 411, 879 A.2d at 1090. The employer did not advise John Doe or his wife about the implications of a false positive Elisa test—specifically, that the false positive could indicate that John Doe was infected with HIV-2. See id. at 411, 879 A.2d at 1090.

In 2000, John Doe tested positive for HIV-2 and was diagnosed with AIDS. See id. at 412, 879 A.2d at 1090. John Doe told his wife, who discovered that she was also infected with HIV-2. See id. at 412, 879 A.2d at 1091. The wife filed a tort action in Maryland state court, which was removed to the United States District Court for the District of Maryland. See id. at 412-13, 879 A.2d at 1091. The employer filed a motion to dismiss, which the District Court granted; the wife appealed to the Fourth Circuit, which certified questions of law to this Court. See id. at 413, 879 A.2d at 1091.

As to the issue of whether, under Maryland law, the employer owed John Doe's wife a duty of care, we agreed with the wife that it was foreseeable under the circumstances that she could contract HIV-2, explaining:

> Assuming the accuracy of the allegations within the complaint, [the employer] manufactured HIV-2. As a laboratory technician for [the employer], Mr. Doe was exposed to high concentrations of HIV-2. It was foreseeable that Mr. Doe could contract HIV-2. As HIV-2 can be transmitted through sexual relations, it should have been foreseeable to [the employer] that Mr. Doe's wife could contract the virus.

Id. at 416-17, 879 A.2d at 1093. We stated, however, "that foreseeability alone is not sufficient to establish duty." Id. at 417, 879 A.2d at 1093 (cleaned up). We explained that there was no Maryland case holding that an employer owes a duty to an employee's spouse, and we noted that, in Dehn, we had declined to hold that a doctor owed a duty to a patient's

- 34 -

spouse. See Doe, 388 Md. at 417, 879 A.2d at 1094. In Doe, id. at 419-20, 879 A.2d at 1095, we found Dehn instructive and similarly held that the employer owed no duty to an employee's spouse, stating:

> [The employer] had the responsibility, according to Ms. Doe, to inform Mr. Doe of the meaning of the laboratory test results for his health and the implications of the results for his future conduct. In this context, an employer could owe a duty to a third party only in extraordinary circumstances. Such extraordinary circumstances do not exist in this case. Ms. Doe had no relationship with [the employer]. There is no assertion in the complaint that she was ever an employee of [the employer], that she had ever been tested for HIV or any other disease by [the employer], or that she had ever had any contact with [the employer].

We expressed concern that the wife's proposed duty of care "would create an expansive new duty to an indeterminate class of people[,]" *i.e.*, any potential future sexual partner of the husband. Doe, 388 Md. at 420-21, 879 A.2d at 1095-96. We explained that the problem with recognizing a duty that "encompass[es] an indeterminate class of people is that a person ordinarily cannot foresee liability to a boundless category of people." Id. at 421, 879 A.2d at 1096 (citation omitted).

We rejected the wife's arguments that other factors—moral blame and public policy—weighed in favor of holding that the employer owed her a duty of care. See id. at 422-23, 879 A.2d at 1096-97. As to moral blame, we reasoned that, although the employer's alleged failure to inform John Doe that a false positive could indicate that he was actually infected with HIV-2 could support a finding of negligence as to John Doe, it did "not support moral blameworthiness or a duty of care to Ms. Doe." Id. at 422, 879 A.2d at 1097. As to public policy, we agreed with the wife that it is a "valid and important public policy" "to avoid the spread of a highly communicable lethal human disease and to

require the people or entities that are in a position to stop the spread of a disease to do so." Id. at 422, 879 A.2d at 1097. Nevertheless, we concluded that there was "no indication . . . that the policy" applied in Doe, explaining that the case was not one "in which an actor, such as a doctor, knew or should have known that an unsuspecting person had or was likely to have a disease and failed to advise that person or a third party to avoid transmission of the contagion." Id. at 422-23, 879 A.2d at 1097 (citations omitted).

In Gourdine, 405 Md. at 726-77, 955 A.2d at 772-73, a products liability case, this Court held that a drug manufacturer did not owe a duty of care to a third party where an individual who had been taking drugs manufactured by the company suffered an adverse reaction and struck a vehicle driven by the third party, resulting in the third party's death. In that case, Ellen Crews, a diabetic, took a combination of insulin medications manufactured by Eli Lilly and Company. See id. at 726, 955 A.2d at 772. While driving, Crews hit a vehicle that was driven by Isaac Gourdine, which resulted in Gourdine sustaining a mortal head wound. See id. at 728, 955 A.2d at 773. Gourdine's widow, on behalf of herself, his estate, and their children, sued Lilly and others, alleging that Lilly owed a duty to Gourdine. See id. at 728-29, 955 A.2d at 773-74. Lilly moved for summary judgment, arguing that it did not owe a duty to warn Gourdine. See id. at 730, 955 A.2d at 774. Gourdine's widow responded that Lilly owed Gourdine a duty to warn Crews about the risks of the combination of insulin drugs because it was foreseeable to Lilly that Crews, "allegedly suffering an adverse reaction to the medications, would cause injury and death to third persons while she was operating a motor vehicle[.]" Id. at 731, 955 A.2d at 775. The trial court granted Lilly's motion for summary judgment, ruling that it did not owe a

duty to Gourdine. See id. at 731, 955 A.2d at 775. Gourdine's widow appealed, and the Court of Special Appeals affirmed. See id. at 733, 955 A.2d at 776.

In evaluating the case, this Court discussed whether a duty existed under the common law, and stated that "[d]uty requires a close or direct effect of the tortfeasor's conduct on the injured party." Id. at 746, 955 A.2d at 784. We explained:

> As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.

> This limitation is to some extent associated with the nature and degree of the connection in fact between the defendant's acts and the events of which the plaintiff complains. Often to greater extent, however, the legal limitation on the scope of liability is associated with policy[—]with our more or less inadequately expressed ideas of what justice demands.

Id. at 747, 955 A.2d at 784 (cleaned up). Applying those principles, we observed that "there was no direct connection between Lilly's warnings, or the alleged lack thereof, and [] Gourdine's injury[,]" and that there was no contact whatsoever between Lilly and Gourdine. Id. at 750, 955 A.2d at 786. We concluded that imposing a duty between Lilly and Gourdine "would expand traditional tort concepts beyond manageable bounds[] because such duty could apply to all individuals who could have been affected by [] Crews after her ingestion of the drugs[,]" resulting in Lilly essentially owing "a duty to the world, an indeterminate class of people, for which we have resisted the establishment of duties of care." Id. at 750, 955 A.2d at 786 (cleaned up). We rejected Gourdine's widow's other arguments and determined that, "although there may be circumstances where foreseeability alone may give rise to liability to a third party because of policy reasons, this is not the

- 37 -

case[,]" and, as such, "Lilly did not owe a duty to [] Gourdine." Id. at 754, 955 A.2d at 789.

In contrast to Dehn, Doe, and Gourdine, in Kiriakos, 448 Md. at 455, 139 A.3d at 1015, after balancing the traditional factors used to determine the existence of a duty, this Court held that a duty existed under the common law. Specifically, in Kiriakos, id. at 455, 139 A.3d at 1015, we held "that there exists a limited form of social host liability sounding in negligence—based on [a] strong public policy reflected in [a statute], but that it only exists when the adults in question act knowingly and willfully, as required by the statute." In separate cases, underage individuals became intoxicated at residences of adults; one of the underage individuals then rode in the bed of a pickup truck that crashed and was killed, and the other underage individual drove a vehicle and hit a pedestrian, who received life-threatening injuries. See id. at 450-53, 139 A.3d at 1012-14. In both cases, the underage individuals' "consumption of alcohol was done with the knowledge and consent of the adult property owner" in violation of a criminal statute. Id. at 450, 139 A.3d at 1012.

We concluded that the pedestrian could "maintain a limited social host cause of action against [the adult property owner] through common law tort principles, like negligent entrustment, based on the strong public policy evident in" the statute at issue. Id. at 486, 139 A.3d at 1033. We observed that "[o]ur decision [was] consonant with the classic factors we use to decide questions of duty under the common law[.]" Id. at 486, 139 A.3d at 1033. We addressed each of the seven factors, beginning with foreseeability of the harm. See id. at 486-87, 139 A.3d at 1034. With respect to the foreseeability of the harm, we noted that it was alleged, among other things, that the adult who served the

alcohol had two conversations with the underage individual concerning the extent of his drinking, and knew that the underage individual, who had driven to the adult's house, was likely to drive after drinking. See id. at 487, 139 A.3d at 1034. We concluded that, "[b]ased on these allegations, and the universally understood risk of harm that underage drunk driving poses to the traveling public, [the pedestrian]'s injuries were foreseeable." Id. at 487, 139 A.3d at 1034.

We also concluded that the factor of the degree of certainty that the plaintiff suffered the injury weighed in favor of imposing a duty, noting that the underage individual pled guilty to causing life-threatening injuries to the pedestrian because he drove under the influence, and testified at a deposition that his actions caused the injuries. See id. at 488, 139 A.3d at 1034. Similarly, we determined that the closeness of the connection between the defendant's conduct and the injury suffered weighed in favor of civil liability. See id. at 488, 139 A.3d at 1034-35. We explained that the "long-standing rule that the law (apart from statute) recognizes no relation of proximate cause between a sale of liquor and a tort committed by a buyer who has drunk the liquor" did not extend to the circumstance of an underage individual consuming alcohol on an adult's property with the adult's complicity, and instead concluded that there was "a sufficient connection between" the adult's conduct and the harm to the pedestrian that we would "not foreclose liability." Id. at 488, 139 A.3d at 1035. We also emphasized that the nature of the risk was relevant because, "where the risk is death or personal injury, a close connection between [the adult] and [the pedestrian] is not required." Id. at 488, 139 A.3d at 1035.

With respect to moral blame, we explained that the "standard is not evidence of

intent to cause harm[,]" but rather "the reaction of persons in general to the circumstances." Id. at 489, 139 A.3d at 1035 (cleaned up). We pointed out that the General Assembly had specifically enacted a statute to hold adults responsible for underage drinking that occurs on their property, and determined "that the general public would consider [the adult]'s conduct blameworthy" because the adult "allegedly not only permitted but facilitated [the underage individual]'s drinking on his property to the point of intoxication[.]" Id. at 489, 139 A.3d at 1035. We also determined that the factor of the policy of preventing future harm weighed in favor of imposing a duty, explaining:

> The General Assembly's decision to punish adults who furnish alcohol to underage persons or otherwise tolerate it, occurred in the wake of a report to combat drunk driving, and statistics attesting to the pervasive dangers of drunk driving. It is transparent that this legislative action and the impetus for it provide a strong incentive to prevent the occurrence of the harm that befell a victim like [the pedestrian].

Id. at 490, 139 A.3d at 1036.

We concluded that the factor of the extent of the burden on the defendant and consequences to the community of imposing a duty weighed in favor of imposing liability. See id. at 490-91, 139 A.3d at 1036-37. Specifically, we stated that "[t]he consequences of underage drinking are great—such that the burden on [the adult] of denying youths access to alcohol hardly warrants discussion[,]" and that, by statute, the adult could not allow a person whom he knew to be underage to drink on his property. Id. at 491, 139 A.3d at 1036 (footnote omitted). We noted that the burden on the adult was not a heavy one, and, indeed, the adult "could have easily conformed his conduct to the law by refraining from furnishing alcohol to" the underage individual. Id. at 491, 139 A.3d at

1036-37. We declined to address the seventh factor—availability, cost, and prevalence of insurance for the risk involved—because the record did not contain evidence of the availability of homeowner's or renter's insurance for injuries that resulted from serving alcohol to underage people. See id. at 492, 139 A.3d at 1037. Given that six of the seven factors weighed in favor of imposing a duty, in Kiriakos, id. at 492, 139 A.3d at 1037, we concluded that the "seven-pronged test support[ed] our conclusion that a cognizable duty was adequately alleged."

Similarly, in May v. Air & Liquid Sys. Corp., 446 Md. 1, 5, 129 A.3d 984, 986 (2015), this Court considered "whether a manufacturer can be liable for failing to warn about the risk of harm from exposure to asbestos-containing replacement parts that it neither manufactured nor placed into the stream of commerce, but which were integral to the operation of its product." In determining whether a duty to warn, *i.e.*, a duty of care, existed, we analyzed the same seven factors as in Kiriakos, and concluded that a duty to warn existed under certain limited circumstances, explaining:

> As we have said, in negligence cases involving personal injury, the principal determinant of duty is foreseeability. *Doe* [], 388 Md. [at] 416, 879 A.2d [at] 1093 []; *Jacques* [], 307 Md. [at] 534-35, 515 A.2d [at] 759-60 []. The foreseeability of harm to workers servicing pumps with asbestos gaskets and packing is especially strong where a manufacturer knows or should know that these components are necessary to the proper functioning of its product and must be replaced periodically. Evaluating the other factors, we consider that four factors favor imposing a duty, one is neutral, and only one slightly tips against imposing a duty. When these factors are considered along with the predominant foreseeability factor, finding a duty becomes the clear choice. Thus, we conclude that the duty to warn in this context exists in the limited circumstances when (1) a manufacturer's product contains asbestos components, and no safer material is available; (2) asbestos is a critical part of the pump sold by the manufacturer; (3) periodic maintenance involving handling asbestos gaskets and packing is required; and (4) the manufacturer

knows or should know of the risks from exposure to asbestos.

May, 446 Md. at 10-11, 18-19, 129 A.3d at 989, 994.

**Analysis**

Here, we hold that a duty of care exists in the limited circumstances where: (1) a medical research institute knows of the presence of a child, who is not a participant in a research study concerning lead-based paint abatement of a property, who resides at a property that is subject to the research study during a participant child's enrollment in the study; (2) the medical research institute has signed a consent agreement with a parent or guardian for a participant child's enrollment in the research study and both the participant and non-participant children reside at a property subject to the study; (3) the medical research institute knows or should know of the presence or suspected presence of lead in the property; (4) the medical research institute determined the level of lead-based paint abatement for the property;[8] and (5) the non-participant child who resided at the property

---

[8]At oral argument, a question arose as to whether a landlord/owner of a property subject to the R&M Study had the ability to make lead-based paint abatement repairs different from the level of repair set by the study. KKI's counsel asserted that landlords could make independent decisions about lead-based paint abatement and that some used their own funds to make their own repairs. KKI's counsel claimed that these properties stayed in the study and that "[s]ome landlords did their own repairs. Some landlords did more. Some landlords did nothing." When asked by the Court about the practical implications on the R&M Study of landlords being able to act independently with respect to lead-based paint abatement, *i.e.*, whether that would have affected the data/results of the study, KKI's counsel asserted that no one would have stopped a landlord from completing repairs above that required by the study. When asked whether the record in this case contained any examples of situations in which a landlord made repairs independent of the R&M Study, KKI's counsel stated that he did not believe that matter was at issue in the case. And, when asked a similar question again, KKI's counsel simply stated that the case was decided on summary judgment and that "that was not an issue on summary judgment." (Continued...)

during the research study was allegedly injured by being exposed to lead at the property.

The bottom line is that we hold that, under the circumstances alleged in this case,

considering the record in a light most favorable to the non-moving party, on the question

of duty, it was error to grant summary judgment in favor of KKI on grounds that KKI owed

no duty of care to Ashley under the common law.[9]

### *Traditional Tort Law Analysis*

Our holding follows traditional tort law principles that apply to the determination of

whether a duty exists under the common law, which we address in detail below.  See

Kiriakos, 448 Md. at 486, 139 A.3d at 1033-34 (This Court set forth the seven "classic

factors" used to determine whether a duty exists under the common law.); see also May,

---

Put simply, KKI's counsel was unable to identify anything in the record demonstrating that the owner in this case or landlords in general performed lead-based paint abatement above the level set by the R&M Study.  As a practical matter, logic would dictate that, if a landlord/owner completed repairs above that set by the R&M Study, then that property would no longer qualify to be a part of the group to which it was designated—Group 1, 2, or 3—because more funds would have been expended than set for the group to which the property was assigned.  This necessarily would have affected or undermined the research of the R&M Study.  In any event, here, the record is devoid of any suggestion that CFOD-2 or Polakoff performed lead-based paint abatement efforts at the Property in excess of the $3,500 of repairs set for Group 2 properties.  That the agreement between KKI and a landlord/owner may not have specifically prohibited the landlord/owner from performing additional abatement repairs is of no moment.  In this case, the record demonstrates that KKI determined the level of lead-based paint abatement for the Property and that the fourth factor for the existence of a duty of care is satisfied.

[9]Our holding is limited to the circumstances of this case and, specifically, to the circumstance that the record demonstrates that KKI knew that Ashley resided in the Property with a participant of the R&M Study.  In other words, we leave for another day the question of whether KKI would owe a duty to an individual who KKI should have known resided in a property subject to the R&M Study with a participant of the study.  We need not wade into the waters of defining the parameters of a "should have known" standard because our holding applies to individuals, such as Ashley, who KKI **knew** resided in a property with a participant of the R&M Study.

446 Md. at 10-11, 129 A.3d at 989 (same).  Moreover, although our analysis could end there, we are also convinced that, aside from there being a duty of care alleged, based on the factors set forth by this Court in Kiriakos, the grant of summary judgment in KKI's favor was improper because there was sufficient evidence for the case to be submitted to the trier of fact for a determination as to whether a special relationship between KKI and Ashley existed.  Cf. Grimes, 366 Md. at 113-14, 782 A.2d at 858.

We first examine whether there need be a "direct relationship," as KKI contends, or a special relationship between KKI and Ashley for a duty of care to exist.  There are "two major considerations" when "determining whether a tort duty should be recognized in a particular context"—(1) "the nature of the harm likely to result from a failure to exercise due care, and [(2)] the relationship that exists between the parties."  Jacques, 307 Md. at 534, 515 A.2d at 759.  Significantly, "where the risk created is one of personal injury," as opposed to economic loss only, a "direct relationship need [not] be shown, and the principal determinant becomes foreseeability."  Id. at 534-35, 515 A.2d at 759-60 (citations omitted).  Stated otherwise, in cases where personal injury is alleged, as in this case, the focus is less on whether a direct or special relationship existed between the plaintiff and defendant, and more on the foreseeability of the harm to the plaintiff.

Although a special relationship certainly may be the basis for a duty of care, duty can be established in other ways.  Utilizing the traditional test for determination of a duty of care and considering the seven classic factors that this Court has time and time again used in determining the existence of a duty under the common law—namely, the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered

injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and the consequences to the community of imposing a duty, and the availability, cost, and prevalence of insurance for the risk involved, see Kiriakos, 448 Md. at 486, 139 A.3d at 1033-34—leads to the conclusion that Ashley has set forth sufficient allegations to conclude that a cognizable duty of care arose in this case.

We begin by examining the foreseeability of harm to Ashley, and conclude that, taking the facts as alleged by Ashley, the harm to her was highly foreseeable. What we said in Grimes, 366 Md. at 98, 782 A.2d at 849, concerning the foreseeability of harm to children as a result of the R&M Study being well known to KKI applies with equal force to the circumstances of this case:

> [T]he risks associated with exposing children to lead-based paint were not only foreseeable, but were well known by KKI, and, in fact, it had to have been reasonably foreseeable by KKI that the children's blood might be contaminated by lead because the extent of contamination of the blood of the children would, in significant part, be used to measure the effectiveness of the various abatement methods.

Indeed, in Grimes, id. at 103, 782 A.2d at 852, we "recognize[d] that potential harm to the children participants of [the R&M S]tudy was both foreseeable and potentially extreme."

Ashley, who was a five-year-old child when she began residing in the Property, faced the same potential harm at the same exact time, in the same manner, and under the same conditions as Anquenette, her two-year-old participant-sister. It is entirely reasonable to conclude, given that KKI knew that Ashley was residing in the Property, that the harm

to Ashley, like any harm to her participant-sister, was "foreseeable and potentially extreme." Id. at 103, 782 A.2d at 852. KKI could have anticipated that both participant children and non-participant children living in Group 2 properties could accumulate lead in their blood as a result of the R&M Study, and be injured. Based on the record in this case, Ashley's alleged injuries were eminently foreseeable. The factor of foreseeability of harm weighs strongly in favor of imposing a duty on KKI.

With respect to the degree of certainty that Ashley suffered the injury, Ashley alleged that she was exposed to lead at the Property as a result of the R&M Study, thereby causing her permanent injury. Indeed, in the complaint, Ashley alleged that lead poisoning caused her severe and permanent brain damage, as well as physical pain and mental anguish, and that her IQ has been significantly diminished. Specifically, in response to defense motions, Ashley submitted a neuropsychological evaluation, which indicated that her full-scale IQ is 65. And, allegedly, while residing at the Property, Ashley had elevated blood-lead levels. In exhibits attached to a motion for partial summary judgment, Ashley included records reflecting the following. Within four months after moving into the Property, Ashley's blood-lead level was reported as 21 micrograms per deciliter (µg/dL). Later, while still residing at the Property, Ashley's blood-lead level was reported as "19, 19."[10] On or about February 16, 1995, Ashley allegedly moved out of the Property; on February 17, 1995, Ashley's blood was collected, and on February 20, 1995, Ashley's

_____

[10]It appears that the blood-lead level result of "19, 19" reported by KKI could be read to mean 19 µg/dL.
(Continued...)

- 46 -

blood-lead level was reported as 13 µg/dL. Then, in a follow-up visit a few days later, Ashley's blood-lead level was reported as 16 µg/dL.[11] The certainty factor is enhanced by our recognition in earlier cases that lead-based paint often causes brain injury to children. See, e.g., Sugarman v. Liles, ___ Md. ___, ___ A.3d ___, 2018 WL 3642143 (Md. July 31, 2018); Levitas v. Christian, 454 Md. 233, 164 A.3d 228 (2017). Based on the information that Ashley has produced in support of her claim, the factor concerning the degree of certainty that she has suffered injury plainly weighs in favor of establishing a duty.[12]

---

[11]Before moving into the Property, Ashley had reported blood-lead levels of 18 µg/dL and 21 µg/dL.

[12]The record demonstrates the following pattern with respect to Ashley's blood-lead levels: before moving into the Property, her levels were 18 µg/dL and 21 µg/dL; while residing in the Property, her levels were 21 µg/dL and 19 µg/dL; and, after moving out of the Property, her levels were 13 µg/dL and 16 µg/dL. To be sure, this indicates that at one point Ashley's blood-lead level decreased slightly—from 21 µg/dL to 19 µg/dL—while she resided in the Property, and decreased further shortly after she moved out of the Property. That Ashley's blood-lead level decreased slightly while residing in the Property, however, does not necessarily demonstrate that she was not injured by lead at the Property. Indeed, Ashley's blood-lead levels remained elevated both during and after she resided in the Property. See Grimes, 366 Md. at 59 & n.23, 782 A.2d at 825 & n.23 (This Court indicated that, as of 1993 and 1994, the Centers for Disease Control classified blood-lead levels of 15-19 µg/dL as "Class IIB (Moderately elevated)" and levels of 20-44 µg/dL as "Class III (Highly elevated)[.]").

In Rogers v. Home Equity USA, Inc., 453 Md. 251, 276-77, 160 A.3d 1207, 1222 (2017), a recent opinion from this Court authored by the Honorable Sally D. Adkins, we rejected the contention that a plaintiff alleging negligence in a lead-based paint case has to show a reasonable probability that an elevated blood-lead level represented an increase in the plaintiff's blood-lead level at a particular property, explaining:

> To reach a jury, [the plaintiff] must only show that it is reasonably probable that [the subject property] contributed to his elevated lead levels—he does not have to demonstrate that his lead level increased when he moved in. . . . The fact that a lead-exposed child might have lived or spent time in more than one lead-based-painted property should not foreclose that child as a matter of law from pursuing any one of those potential sources—as long as

(Continued...)

The next factor is the closeness of the connection between the defendant's conduct and the injury suffered. This factor has been described as

> a proximate cause element in that consideration is given to whether, across the universe of cases of the type presented, there would ordinarily be so little connection between breach of the duty contended for, and the allegedly resulting harm, that a court would simply foreclose liability by holding that there is no duty.

Kiriakos, 448 Md. at 488, 139 A.3d at 1034-35 (cleaned up). The allegation in this case is that Ashley was directly injured by the R&M Study in the same manner as her sister, who was a participant in the study. Recognizing that circumstance and that KKI determined the level of repairs made to the Property to abate the presence of lead—*i.e.*, specifically limiting the funds used for abatement in Group 2 houses to $3,500—and that KKI would have been aware of Ashley's elevated blood-lead levels, we conclude that the connection

---

> he is able to rule in the subject property[.] Although [the plaintiff] cannot prove that his blood lead levels increased when he moved to [the subject property], they remained elevated without decrease while he lived there. [A doctor] testified that once [the plaintiff] was no longer exposed to lead, his blood lead levels would decrease after about 30 to 45 days. From this, a jury could reasonably infer that if [the subject property] was not a contributing source, [the plaintiff's] March 1997 lead level would have been lower. . . . Viewing th[e] evidence in the light most favorable to [the plaintiff], a jury could reasonably infer that his blood lead level declined in April 1997 because had left the source of his exposure, which was [the subject property].

(Cleaned up). In other words, a plaintiff alleging negligence in a lead-based paint case is not required to demonstrate that his or her blood-lead level increased when he or she moved into the subject property to establish that property as a reasonably probable cause of his or her elevated blood-lead levels. Thus, in ultimately establishing negligence, it is an issue for the trier of fact to determine whether Ashley's elevated blood-lead levels at the Property demonstrate that she was injured at the Property. We simply conclude that, based on the information that Ashley provided in support of her claim, the factor concerning the degree of certainty that she has suffered injury plainly weighs in favor of establishing a duty.

- 48 -

between KKI's conduct and the alleged harm to Ashley weighs in favor of imposition of a duty.

With respect to the moral blame attached to a defendant's conduct, as we explained in Kiriakos, id. at 489, 139 A.3d at 1035, the "standard is not evidence of intent to cause harm[,]" but rather "the reaction of persons in general to the circumstances." (Cleaned up). The moral blame with respect to the R&M Study and its effect on young children is obvious, and was thoroughly addressed by this Court in Grimes. In Grimes, 366 Md. at 38, 782 A.2d at 812-13, we stated that "it was anticipated that the children, who were the human subjects in the program, would, or at least might, accumulate lead in their blood from the dust, thus helping the researchers to determine the extent to which the various partial abatement methods worked." We explained that, with respect to the R&M Study, "children, especially young children, living in lower economic circumstances, . . . are [] vulnerable[.]" Id. at 45, 782 A.2d at 817. Even though the program may have been well intended in the sense that its ultimate goal was to find practical methods to abate the ill effects of lead-based paint, those conducting the program were required to consider the obvious consequences of their actions, and we attribute moral blame for their failure to do so.

The moral blame of KKI's conduct attendant to children who were participants in the R&M Study was readily apparent to this Court in Grimes. We conclude that KKI's conduct is equally blameworthy with respect to children like Ashley, who KKI knew resided in a property subject to the R&M Study with a participant of the study. Indeed, KKI's conduct is just as blameworthy with respect to Ashley when compared to

- 49 -

Anquenette because KKI's conduct with respect to Ashley reeks of indifference to the circumstance that she was exposed to lead in a house that was subject to the study and for which KKI prescribed limited funds for lead-based paint abatement. Because the R&M Study necessarily would have impacted not only participant children, but also non-participant children residing in properties subject to the study, exposing both sets of children equally to lead, KKI's conduct was just as blameworthy with respect to non-participant children as it was with respect to children participating in the study. The factor of moral blameworthiness weighs in favor of establishing a duty.

As to the policy of preventing future harm, in Kiriakos, 448 Md. at 490, 139 A.3d at 1036, we explained:

> The prophylactic factor of preventing future harm has been quite important in the field of torts. The courts are concerned not only with the compensation of the victim, but with admonition of the wrongdoer. When the decisions of the courts become known, and defendants realize that they may be held liable, there is of course a strong incentive to prevent the occurrence of the harm. Not infrequently[,] one reason for imposing liability is the deliberate purpose of providing that incentive.

(Cleaned up). It is important to prevent medical researchers from using young children in research experiments like the R&M Study, and then disavowing responsibility for children who are not a part of the study but equally exposed to its hazards. There is a strong incentive to prevent the harm that may occur to such children, and to incentivize medical researchers to fully advise parents of the risks attendant to such studies on all children, not just children who participate in the study. This is a case in which KKI knew that a non-participant child, Ashley, was or was likely to be exposed to lead as a result of its conduct in connection to the study. Cf. Doe, 388 Md. at 423, 879 A.2d at 1097 ("[T]his is not a

case in which an actor, such as a doctor, knew or should have known that an unsuspecting person had or was likely to have a disease and failed to advise that person or a third party to avoid transmission of the contagion." (Citations omitted)). The prevention of such future harm is imperative. Consideration of this policy heavily favors imposing a duty.

Concerning the extent of the burden on KKI and consequences to the community of imposing a duty, we conclude that the risk of harm to children who are exposed to lead-based paint outweighs the extent of any burden to KKI of imposing a duty. The consequences of subjecting children to lead and the attendant long-term effects of lead poisoning on developing brains are potentially great, such that the burden of tort liability is outweighed by the benefit of protecting children who were exposed to lead during the R&M Study. This factor strongly favors imposition of a duty of care.

Insofar as the availability, cost, and prevalence of insurance for the risk involved is concerned, on brief, neither party provided information about the availability or cost of insurance. And, at oral argument, Ashley's counsel stated that there was "no evidence [] either way" concerning insurance. In the absence of such information, we decline to address the seventh factor.

Reviewing six of the seven factors, we conclude that the seven-pronged test for balancing the policy considerations necessary to determine whether a duty of care exists under the common law weighs heavily in favor of recognizing such a duty, and, indeed, establishes that KKI owes Ashley a duty of care. In short, in a personal injury case, a duty of care may arise without the existence of a direct or special relationship between a plaintiff and defendant, and such a duty has arisen under a traditional tort law analysis in this case.

- 51 -

### *Special Relationship*

Although our analysis could conclude at this point, we are also convinced that, viewing the record in the light most favorable to Ashley, and construing any reasonable inferences that may be drawn from the facts against KKI, there was sufficient evidence that KKI had a special relationship with Ashley and her family to submit the issue to the trier of fact, *i.e.*, a jury. In other words, the grant of summary judgment in KKI's favor was also improper for this reason. The record reflects that KKI knew that Ashley, then a young child, resided in the Property, which was subject to the R&M Study. KKI knew that the Property contained lead, and that Ashley would be exposed to lead in the same manner and under the same conditions as her participant-sister.

Under the circumstances alleged, the Property qualified for the R&M Study, and was assigned to Group 2; and KKI limited funds for repairs to the Property to $3,500. KKI allegedly sent letters to Martin notifying her of the testing of dust in the Property for lead, the first of which gave the impression that the Property did not contain any lead dust. Two later letters showed that certain locations from which dust was collected contained an "amount of lead [that] was higher than might be found in a completely renovated house." The two later letters suggest that, after the Group 2 abatement procedure, KKI knew that the Property continued to contain lead.

Moreover, Martin testified at a deposition that, while living at the Property, she agreed to send both Ashley and Anquenette to KKI to have their blood drawn. Despite the circumstance that Ashley was not a participant in the R&M Study, KKI maintained records on Ashley, including blood-lead level test results. For example, a Lead Poisoning

Questionnaire completed by a KKI interviewer on November 9, 1994, detailed information about Ashley, such as her residential history, hand-to-mouth activity, diet, behavior and symptoms, social history, and past medical history. To be sure, Ashley was treated at KKI because she had been referred to KKI by the Baltimore City Health Department and not as part of the R&M Study. Nevertheless, KKI was aware of Ashley's presence, her exposure to lead at the Property, and her elevated blood-lead levels while living there.

Considering the above, Ashley has sufficiently alleged that a relationship existed between KKI and Ashley and her family. Among other things, as alleged, KKI had a direct relationship with Ashley's family based on the signed consent form enrolling Anquenette in the R&M Study, and KKI conducted testing of Ashley's blood-lead levels while knowing that she resided at a property subject to the study. KKI determined the level of lead-based paint abatement at the Property through the R&M Study, and KKI knew that the Property contained lead even after abatement. KKI undisputedly knew that Ashley resided at the Property and could be harmed.[13] All of these alleged circumstances support the finding of a special relationship between KKI and Ashley.

In Grimes, 366 Md. at 113, 782 A.2d at 858, we stated that "[t]he determination as to whether a 'special relationship' actually exists is to be done on a case by case basis." (Citation omitted). We explained that consent agreements to enroll children in the R&M Study may, "under certain circumstances, . . . constitute 'special relationships' giving rise

_____

[13]We note that KKI does not dispute that it knew that Ashley resided at the Property. Indeed, at oral argument, KKI's counsel stated that KKI "was aware that" Ashley was living in the Property and that KKI "knew that she was in the house."

to duties, out of the breach of which negligence actions may arise." Id. at 113, 782 A.2d at 858. And, we held "that there was ample evidence in the cases . . . to support a fact finder's determination of the existence of duties arising out of contract, or out of a special relationship, or out of regulations and codes, or out of all of them, in each of the cases." Id. at 114, 782 A.2d at 858. As such, even if a special relationship were required for the imposition of a tort duty in a personal injury case—which it is not—viewing the record in the light most favorable to Ashley, and construing against KKI any reasonable inferences that may be drawn from the facts, leads to the conclusion that there was sufficient evidence to submit the matter to a jury for a determination as to the existence of a special relationship. Because there was sufficient evidence for the case to be submitted to the trier of fact for a determination as to whether a special relationship existed between KKI and Ashley giving rise to a duty of care, in addition to erring by not recognizing the existence of a duty under traditional law analysis, the circuit court erred in granting summary judgment in KKI's favor without permitting the issue of a special relationship to be considered by the jury.

We acknowledge that there is a key factual distinction between Grimes and this case because the plaintiffs in Grimes were participants in the R&M Study, while it is undisputed that Ashley was not. In Grimes, id. at 113, 782 A.2d at 858, this Court held "that, under certain circumstances, [consent] agreements can, as a matter of law, constitute 'special relationships' giving rise to duties, out of the breach of which negligence actions may arise[,]" and "that, normally, such special relationships are created between researchers and the human subjects used by the researchers." In other words, in Grimes, this Court did not

establish all-encompassing standards concerning the creation of a special relationship, or the duty arising out of a researcher-subject relationship in research studies. Indeed, in Grimes, 366 Md. at 119, 782 A.2d at 861, on reconsideration, we clarified that the only legal conclusion that we reached was that, based on the record, the trial courts had improperly granted summary judgment in KKI's favor because there was sufficient evidence that, "if taken in a light most favorable to the plaintiffs and believed by a jury, would suffice to justify verdicts in favor of the plaintiffs." Despite the distinction between Grimes and this case, we reach a similar result here—that Ashley produced sufficient evidence from which a trier of fact could conclude that a special relationship existed between her and KKI, giving rise to a duty of care.

### *Lack of Indeterminate Class of Potential Plaintiffs*

We reject KKI's contention that recognizing a duty in this case creates an indeterminate class of potential plaintiffs and would expose medical research institutions to unending liability. Our primary holding is that KKI owes a duty of care to Ashley and children like her, who were not participants in the R&M Study, but who KKI knew resided with a participant of the study in a property subject to the study. This creates a finite and identifiable group of potential plaintiffs to whom KKI owes a duty of care, and is most likely to encompass siblings or other relatives of participants of the R&M Study who were either too young (under six months old) or too old (over four years old) to be enrolled as participants themselves. In other words, there exists an identifiable, limited class of potential plaintiffs, and recognizing that KKI owes Ashley a duty of care does not subject KKI to unlimited liability. And, at the risk of stating the obvious, just because we hold that

- 55 -

KKI owes Ashley a duty of care, this does not mean that KKI is necessarily liable for negligence. Indeed, to prevail, Ashley and similarly situated children will nonetheless be required to establish the three other elements of negligence—breach of the duty of care, causation, and damages.

### *Inapplicability of* **Dehn**, **Doe**, *and* **Gourdine**

This case is readily distinguishable in several key respects from <u>Dehn</u>, <u>Doe</u>, and <u>Gourdine</u>—cases in which this Court declined to recognize a duty of care. In all three of those cases, the injured person and the defendant had no relationship, or even any contact, whatsoever. In <u>Dehn</u>, 384 Md. at 622, 865 A.2d at 612, we explained that, not only did the wife and her husband's doctor not have a physician-patient relationship, but also, the two had never met or spoken to one another until trial. Similarly, in <u>Doe</u>, 388 Md. at 420, 879 A.2d at 1095, we explained that the employee's wife "had no relationship with" the employer, and that there was "no assertion in the complaint that she was ever an employee of [the employer], that she had ever been tested for HIV or any other disease by [the employer], or that she had ever had any contact with [the employer]." And, in <u>Gourdine</u>, 405 Md. at 750, 955 A.2d at 786, we observed that "there was no direct connection between Lilly's warnings, or the alleged lack thereof, and [] Gourdine's injury[,]" and pointed out that, indeed, there was no contact whatsoever between Lilly and Gourdine. By contrast, here, KKI and Ashley had direct contact with one another. Indeed, KKI had a relationship with Ashley's entire family (herself, Martin, and Anquenette) by virtue of Anquenette's enrollment in the R&M Study, the family's residence at the Property, which was subject to the R&M Study, and KKI's testing of Ashley's blood-lead levels. In short, there was a

relational link and direct contact between KKI and Ashley that was wholly absent between the injured individuals and defendants in Dehn, Doe, and Gourdine.

Moreover, Dehn, Doe, and Gourdine involved sequential attenuated events where the injured individuals, in addition to having no relationship with the defendant, were not directly exposed to a negligent act. For example, in Dehn, 384 Md. at 611-12, 865 A.2d at 606, the alleged negligent act happened to the husband, and the wife was later injured by becoming pregnant. Likewise, in Doe, 388 Md. at 411-12, 879 A.2d at 1090-91, the alleged negligent act occurred with respect to the husband-employee, and his wife was later injured by engaging in unprotected intercourse with the husband and contracting HIV-2. And, in Gourdine, 405 Md. at 726, 955 A.2d at 772, the alleged negligent act—failure to warn— occurred vis-à-vis Crews, the user of the product, and not Gourdine, the injured individual.

By contrast, here, there were no sequential or attenuated events where an injured individual was indirectly exposed to, or affected by, a defendant's alleged negligent act. Rather, any negligence flowing from the R&M Study occurred to Ashley at the same time and location, under the same conditions, and in the same manner as to Anquenette. This is not a situation in which KKI's alleged negligent act occurred only or first with respect to Anquenette, and then Ashley was injured later. Also, in Dehn, 384 Md. at 627, 865 A.2d at 615, Doe, 388 Md. at 420, 879 A.2d at 1095, and Gourdine, 405 Md. at 750, 955 A.2d at 786, this Court concluded that imposing a duty would create an indeterminate class of potential plaintiffs. Such is not the case here. Dehn, Doe, and Gourdine are plainly

distinguishable in key respects from this case, and are not controlling.[14]

## Conclusion

Under the circumstances of this case, based on the seven classic factors utilized by courts for determining whether a duty of care exists, KKI owed Ashley a duty of care under the common law. Thus, the circuit court erred in granting summary judgment in KKI's favor. Additionally, because there was sufficient evidence of a special relationship between Ashley and KKI for the issue to be submitted to a jury, the grant of summary judgment was improper on this ground as well. For these reasons, we affirm the judgment of the Court of Special Appeals.[15]

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY COSTS.**

---

[14]We are unpersuaded by KKI's contention that it was inconsistent for the Court of Special Appeals to determine that a duty existed under the common law, while acknowledging that the evidence supported a finding that KKI did not exercise "charge, care or control" over the Property for purposes of liability under the Baltimore City Housing Code. The Court of Special Appeals concluded that no duty of care arose under the Baltimore City Housing Code because KKI did not satisfy the definitions of "owner," "operator," or "agent" under the Baltimore City Housing Code. See Partlow, 2017 WL 4772626, at *9-10. In sum, the Court of Special Appeals did not determine that there was a lack of control of the Property by KKI, only that KKI did not satisfy the definitions of "owner," "operator," or "agent."

[15]At oral argument, KKI's counsel contended that the Code of Federal Regulations specified "to whom a duty is owed in terms of advising clinical research participants of the risks and benefits of the study[,]" and that imposing a duty to a non-participant of a research study would conflict with those regulations. KKI has not briefed the matter nor brought the Court's attention to any specific regulations that it contends would conflict with imposition of a duty of care. At oral argument, Ashley's counsel noted that, in its amicus brief, Johns Hopkins cited 45 C.F.R. § 46.102(f), a regulation in Part 46, which sets forth the Department of Health and Human Services's policy for protection of human research subjects. Ashley's counsel argued that there would be no conflict with the federal regulations should a duty be imposed on KKI. Given that the issue has not been briefed by the parties, we will not address the matter.

Circuit Court for Baltimore City
Case No. 24-C-09-008243
Argued: May 8, 2018

IN THE COURT OF APPEALS
OF MARYLAND

No. 82

September Term, 2017

_____

KENNEDY KRIEGER INSTITUTE, INC.

v.

ASHLEY PARTLOW

_____

Barbera, C.J.
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Dissenting Opinion by Getty, J., which Barbera,
C.J. and McDonald, J. join.

_____

Filed: August 13, 2018

Respectfully, I dissent. I disagree both with the Court's holding that KKI owed a duty of care to Ashley under traditional common law tort principles and with the Majority's conclusion that there was sufficient evidence of a special relationship between KKI and Ashley, creating another ground on which a jury could find a duty existed. Instead, I would affirm the trial court's decision in granting summary judgment in favor of KKI and adopt the sound reasoning of Judge Berger in his concurring and dissenting opinion in the Court of Special Appeals.

In reaching both of this Court's conclusions, the Majority relies heavily on a previous case: *Grimes v. Kennedy Krieger Inst., Inc.*, 366 Md. 29 (2001). In the original *Grimes* opinion, this Court held that "special relationships, out of which duties arise, the breach of which can constitute negligence, can result from the relationships between researcher and research subjects." *Id.* at 94. Therefore, this Court found that a duty arises by way of a special relationship when a research institute, such as KKI, enters into an agreement with a participating research subject, such as Ashley's sister. Our opinion in *Grimes* did not, however, analyze whether a special relationship existed between a research institute and non-participants. Overall, the *Grimes* Court concluded:

> The determination as to whether a "special relationship" actually exists is to be done on a case by case basis. The determination as to whether a special relationship exists, if properly pled, lies with the trier of fact. We hold that there was ample evidence in the cases at bar to support a fact finder's determination of the existence of duties arising out of . . . a special relationship[.]"

*Id.* at 113–14 (citations omitted).

As the Majority correctly recognizes, KKI filed a motion for reconsideration in *Grimes*. In addition to the research institute, numerous amici[1] filed briefs supporting KKI's motion for reconsideration. This Court ultimately denied the motion for reconsideration, but clarified that "the only conclusion that we reached as a matter of law was that, on the record currently before us, summary judgment was improperly granted[.]" *Id.* at 119.

The legal community expressed the view that *Grimes* left research institutions questioning whether higher standards of care applied to studies conducted in Maryland. Legal scholars also raised concerns that this Court's opinion in *Grimes* improperly characterized the goals of KKI's research. *See White v. Kennedy Krieger Inst., Inc.*, 221 Md. App. 601, 621–22 n. 8 (2015); *see also* David R. Buchanan & Franklin G. Miller, *Justice and Fairness in the Kennedy Krieger Institute Lead Paint Study: the Ethics of Public Health Research on Less Expensive, Less Effective Intervention,* 96 Am. J. Pub. Health 781, 785 (May 2006); Jack Schwartz, *The Kennedy Krieger Case: Judicial Anger and the Research Enterprise,* 6 J. Health Care L. & Pol'y 148 (2002); Loretta M. Kopelman, *Pediatric Research Regulations Under Legal Scrutiny: Grimes Narrows Their Interpretation,* J. Law, Med. & Ethics 38, 41 (2002).

Like Judge Berger, I do not believe that *Grimes* provides this Court with legal support to hold that researchers have a duty to a child who was not a participant in the research study. I am equally concerned that the Majority's holding today has the potential

---

[1] Amici included the Association of American Medical Colleges, the University of Maryland Medial System, Johns Hopkins University, and the Association of American Universities. *Grimes,* 366 Md. at 119, *recons. denied* (Oct. 11, 2001).

2

to create a duty to "indeterminate classes of people." *Partlow v. Kennedy Krieger Inst.*, No. 44, 2017 WL 4772626, at \*13 (Md. Ct. Spec. App. Oct. 23, 2017) (Berger, J., concurring and dissenting). The Majority contends that the class of people to whom KKI will owe a duty of care is "a finite and identifiable group of potential plaintiffs . . . *likely* to encompass siblings or other relatives of participants of the R&M Study who were either too young (under six months old) or too old (over four years old) to be enrolled as participants themselves." Maj. Slip Op. at 54 (emphasis added). In my view, the Majority does not fully appreciate that today's decision "expand[s] the universe of potential plaintiffs." *Dehn v. Edgecombe*, 384 Md. 606, 627 (2005). Indeed, this Court's opinion now exposes KKI to a large number of negligence actions brought by siblings and relatives with whom the researchers did not enter into an agreement, did not monitor "in the same manner as they monitored study participants[,]" and did not purport to provide care. *Partlow*, No. 44, 2017 WL 4772626, at \*14 (Berger, J., concurring and dissenting).

Moreover, the Majority does not consider the possibility that individuals outside of siblings and relatives who live with participants in research study will employ this Court's holding to assert a similarly extended duty of care. For example, a boyfriend or girlfriend who lived full-time in the subject property could argue that this Court's reasoning should apply in his or her circumstance, resulting in KKI owing a duty to individuals unrelated to study participants. Another potential plaintiff could be the children of boyfriends, girlfriends, or other residents of a transient nature, who resided in the subject property part-time but did not participate in the research study. Such an unrelated child could also argue that a duty of care should be extended to those circumstances. As is exposed by these

3

hypotheticals, this Court has intentionally limited a duty of care to "manageable bounds" to prevent boundless liability based on the same action. *Dehn*, 384 Md. at 627. In other words, I fear the Court's extension of our limited holding in *Grimes*, 366 Md. at 94, to a duty of care owed to non-participant children will eventually be extended to another class of potential plaintiffs, leading to further unforeseen liability for researchers. Thus, I would hold that a duty of care to a non-participant child "is not one which Maryland law is prepared to recognize[.]" *Dehn*, 384 Md. at 627.

I am also concerned by the fact that the Majority expanded the holding of the Court of Special Appeals below. Specifically, the Court of Special Appeals majority opinion by The Honorable Douglas R. M. Nazarian held only that there was a special relationship between KKI and Ashley, requiring the same duty of care to Ashley that KKI owed to study participants. *Partlow*, No. 44, 2017 WL 4772626, at *8–9. This Court today holds: (1) KKI owed a duty of care to Ashley under traditional common law tort principles; **and** (2) that there is sufficient evidence to find a special relationship between KKI and Ashley, creating a duty of care. The two holdings by this Court provide potential plaintiffs with two alternatives from which to plead duty of care. As a result of the Majority's expanded holding, non-participant individuals can now file a complaint for negligence against KKI alleging that the research institute owed a duty of care under traditional common law tort principles and that there was a special relationship, providing an alternative ground from which a court can find a duty of care. Therefore, I am even more troubled by the possibility that an indeterminate class of potential plaintiffs now has **two** options from which to allege duty of care on the part of research institutions.

4

For these reasons, I respectfully dissent.  Chief Judge Barbera and Judge McDonald have authorized me to state that they join this dissenting opinion.